UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| Plaintiff, : | Civil Action No. |
| v. : | **Jury Trial Demanded** |
| INOFIN, INC., MICHAEL J. CUOMO, : <br> KEVIN J. MANN, SR., MELISSA GEORGE, : <br> THOMAS KEVIN KEOUGH, AND DAVID AFFELDT, : | |
| Defendants, : | |
| NANCY KEOUGH, : <br> Relief Defendant. : | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges:

### Summary

1.   Inofin, Inc., a Massachusetts corporation, and the individual defendants named herein have illegally raised at least $110 million from hundreds of investors residing in twenty-five states and the District of Columbia through the sale of unregistered securities by, among other things, making material misrepresentations about Inofin's financial performance, its business activities, and the use of investor funds.

2.   Since 1994, Inofin has held itself out to the investing public as a motor vehicle sales finance company specializing in the purchase of subprime auto loans.  Although the company has never submitted a registration statement to the Commission, Inofin raised funds from investors through the offer and sale of debt securities.

3.   From at least 2004 through 2010, Inofin and its principal officers, President Michael

Cuomo ("Cuomo"), Chief Executive Officer Kevin Mann ("Mann"), and Chief Operating

Officer Melissa George ("George") misrepresented to investors that the company uses investor

money for the sole purpose of funding subprime auto loan lending activity. As part of the pitch,

Inofin and its principals told investors that they could expect to receive returns from nine to

fifteen percent on their investment because Inofin loaned investor money to its subprime

borrowers at an average rate of twenty percent.

4.   Since at least 2005, however, Inofin and its principal officers have known that these

representations omitted certain material facts that misled investors about the substance of

Inofin's true lending activities. Beginning in 2005 and continuing through 2010, Inofin and its

principals have failed to inform investors that Inofin lent approximately a third of its capital to

businesses established and controlled by and for the benefit of Cuomo and Mann for the purpose

of starting four used car dealerships and engaging in multiple commercial and residential real

estate property developments. Inofin and its principals also failed to disclose that the "non auto"

loans were made at rates that were substantially lower than the subprime auto loan rates

advertised to investors.

5.   Since at least 2006, Inofin and its principals have also materially misrepresented Inofin's

financial performance. As early as 2006 and continuing through 2011, Inofin has had a negative

net worth and a progressively deteriorating financial condition. This deterioration has been

caused not only by the failure of Inofin's undisclosed business activities, but also by its

management's conduct in selling off of Inofin's core auto loan portfolio at a discount in order to

solve ever increasing cash shortages. Nevertheless, from 2006 through 2010, Inofin and its

principal officers continued to offer and sell Inofin securities, knowingly or recklessly

misrepresenting to investors that Inofin was a profitable business and a sound investment.

6.   In addition, as explained in further detail below, beginning in 2006 and continuing through April 2010, Inofin's principals engaged in a scheme to defraud investors by maintaining Inofin's license to do business as a motor vehicle sales finance company by preparing and submitting materially false financial information to its licensing authority, the Massachusetts Division of Banks.

7.   Finally, Inofin's capital raising activities have been supported by, among other things, commission-based sales agents that included David Affeldt and Thomas K. ("Kevin") Keough. They successfully promoted the offering and sale of Inofin's unregistered securities.  Based on these sales, they collectively (together with Kevin Keough's wife Nancy Keough) received several hundred thousand dollars in commissions.

8.   In January 2011, Inofin sent a written communication to investors disclosing for the first time any hint of financial trouble.  The company sent investors a letter and an "audited" balance sheet for the year ended December 31, 2009.  The balance sheet disclosed that, by the end of 2009 (nearly 13 months earlier), the company had incurred at least $35 million in accumulated deficits from its inception, the company's liabilities exceeded its assets by approximately $29 million, and the company was therefore insolvent on a balance sheet basis.  This 2009 balance sheet further disclosed that at least $19 million worth of these losses were attributable to loans that Inofin made to the auto dealerships and real estate entities.  The letter explained that these losses had been mounting since at least 2004 when the company first engaged in "non auto loans" that did not earn the high rates of return Inofin received on the subprime auto loans.

9.   By knowingly and recklessly engaging in the fraudulent conduct described herein, Defendants Inofin, Cuomo, Mann, and George violated the antifraud provisions of the federal securities laws, specifically, Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")
[15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.  By engaging in the conduct described herein, Inofin, Cuomo, Mann, George, Kevin
Keough, and David Affeldt violated the registration provisions of the federal securities laws,
specifically, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

11.  By engaging in the conduct herein, Kevin Keough, and David Affeldt acted as
unregistered broker-dealers in violation of the registration provisions of the federal securities
laws, specifically, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### Authority and Jurisdiction

12.  The Commission brings this action pursuant to enforcement authority conferred by
Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C.
§ 78u].

13.  This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act
[15 U.S.C. § 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u & 78aa].  The
District of Massachusetts is the proper venue for this action under Section 22(a) of the Securities
Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because
Inofin's principal place of business is located in Rockland, Massachusetts, the unlawful
securities offering and sales activities were completed through the documentation of sales
transactions that were executed solely out of Inofin's principal place of business, and Cuomo,
Mann, George, Kevin Keough and Nancy Keough are all inhabitants of Massachusetts.

14.  Defendants, directly or indirectly, have made use of the means and instrumentalities of
interstate commerce, or of the mail in connection with the acts, practices, and course of business
alleged herein.

## Defendants

15.  Inofin, Inc. ("Inofin") is a Massachusetts corporation that has its principal place of business in Rockland, Massachusetts.  The company was incorporated in 1994.  Neither Inofin nor its securities have ever been registered with the Commission.  Through the sale of unregistered securities, Inofin has raised at least $110 million.  Inofin is currently under the supervision of a Chapter 7 bankruptcy trustee who was appointed by the United States Bankruptcy Court of the District of Massachusetts.

16.  Michael J. Cuomo ("Cuomo") is a resident of Plymouth, Massachusetts.  During the time period 1994 through January 2011, Cuomo served as Inofin's President and as a member of its board of directors.

17.  Kevin J. Mann, Sr. ("Mann") is a resident of Marshfield, Massachusetts.  During the time period 1994 through January 2011, Mann served as Inofin's Chief Executive Officer and as a member of its board of directors.

18.  Melissa George ("George") is a resident of Duxbury, Massachusetts.  During the time period 2006 through January 2011, George served as Inofin's Chief Operating Officer and Chief Financial Officer.  Before serving as Chief Financial Officer, from 2004 through 2006 George worked with Inofin's comptroller, R.D., who resigned from the company in November 2006.  From 2004 through March 2008, George also served as Inofin's investor relations point of contact.

19.  Thomas Kevin Keough ("Kevin Keough") is a resident of North Reading, Massachusetts. From April 2000 through April 2006, Kevin Keough was a registered representative employed by Morgan Stanley Dean Witter, Inc.  From April 2006 through March 2011, he was a registered representative employed by Raymond James Financial Services, Inc.  From March 29, 2011

through the present, Kevin Keough has been a registered representative employed by Bishop, Rosen & Co.

20.   David Affeldt ("Affeldt") is a resident of Potomac, Maryland.  Affeldt is a tax attorney admitted to the bar for the District of Columbia.

### Relief Defendant

21.   Nancy Keough is a resident of North Andover, Massachusetts, and the wife of Kevin Keough.

### Facts

**A.   An Overview of Inofin's Subprime Auto Sales Financing Business**

22.   Since 1994, Inofin has engaged in the business of motor vehicle sales finance, specializing in indirect lending for subprime auto loans.  As an auto sales finance company, Inofin underwrites the lending activities of used car dealerships by purchasing consumer loans extended by the dealerships to subprime borrowers.  Inofin uses a network of several hundred independent used car dealerships across several states, with most of the member dealerships are located in the New England region.

23.   Typically, Inofin and the dealerships would sign an agreement establishing Inofin as a subprime lending source for the dealerships' customers and establishing the terms on which Inofin would purchase the dealerships' retail installment sales contracts.

24.   To purchase a car under the Inofin indirect lending program, the purchasing consumer signed a retail installment contract generated by Inofin.  The dealer's signature as the seller on this contract simultaneously accepted the contract and assigned it to Inofin.  Once the contract was signed by the consumer, as buyer, and the dealership, as seller and assignee, Inofin paid money directly to the dealership to fund the loan.

25. The Inofin indirect lending program has had a number of features designed to maximize Inofin's rate of return in a risky subprime lending market.

26. First, Inofin required its retail installment contracts to charge high rates of interest to the borrower, typically twenty percent per year.

27. Second, Inofin required that borrowers repay amounts due under the retail installment contracts in weekly payments of principal and interest.

28. Third, in purchasing the contracts from the dealers, Inofin held back fifteen percent of the principal of each loan.  Inofin retained this "holdback" until it received all of the principal and interest due to it under the consumer contract (total contract payable amount minus the holdback).  In other words, the holdback was due from Inofin to the dealer on the backend of the loan payments.

29. Fourth, Inofin charged the dealer an "acquisition fee" of approximately twenty percent of the net principal balance after the dealer holdback.

30. Accordingly, on each retail consumer sales contract purchased by Inofin, the dealer initially received only sixty eight percent of the principal amount.  The dealer may have received fifteen percent of net principal that Inofin held back, but only if the consumer first made every payment on the contract up to the remaining holdback.  If the consumer failed to make sufficient payments on the contract, Inofin was able to keep the holdback amount.

31. Finally, each member dealership was required to guarantee the full amount of contracts assigned to Inofin in the event of buyer default.

*i.   Licensing*

32. To operate this motor vehicle sales financing business, Inofin was required to be licensed by the states in which it made subprime auto loans.  The primary licensing authority for Inofin

was the Massachusetts Division of Banks ("Division of Banks").  To maintain a motor vehicle

sales finance company license in the Commonwealth of Massachusetts, the Division of Banks

required Inofin to maintain a positive net worth of at least $20,000, to certify annually its net

worth and adjusted net worth, and to submit annually a License Renewal Application.

ii.   *Lending Base—Investment Fund*

33.   Inofin offered investors the opportunity to loan the company money for a term of three

years in exchange for a fixed rate of interest per year. Inofin's lending capital came from

investors who resided both within and outside the Commonwealth of Massachusetts. In 2010,

Inofin had approximately 275 investors who resided in the District of Columbia and twenty-five

states, including Massachusetts, Maryland, Virginia, Rhode Island, and Florida.

34.   In exchange for investor money, Inofin gave its investors a "Loan Agreement" and a

"Promissory Note."

35.   From 2004 through 2010, Inofin issued promissory notes with interest rates ranging from

nine percent to over fifteen percent per year.  The company had no formula for determining the

interest rate to offer a potential investor.  About two-thirds of Inofin's investors held notes with

interest at rates between thirteen and fifteen percent per year.  Investors had the option to receive

their monthly interest payments or to have the interest added to their principal balance due from

the company.

36.   Once Inofin investors handed over their money, however, they had no role in directing

how Inofin used their funds.  The company placed the funds in an Inofin bank account Inofin

used to fund all of its operations.  Investors had no input into which loans Inofin funded and had

no involvement in evaluating the risk associated with individual loans.  Inofin and its principals

exercised total control over how the company used investor funds.  The returns Inofin's investors

expected to receive were wholly dependent on the success of Inofin.

37.   For a small group of approximately five preferred investors, Cuomo and Mann offered and sold security interests along with the investor notes.  These investors, who were typically large investors, received a secured interest in specific named retail installment contracts sufficient to cover between 110 to 120 percent of their investment.  Because these retail installment contracts were payable on a weekly basis, Inofin provided these investors with an updated collateral list on a weekly basis.  Each week the list would designate the contracts assigned to or earmarked as the investor's secured collateral.

38.   With the exception of these five preferred investors, all Inofin investors were unsecured and were never offered, or even told of, the possibility of holding a security interest.

**B.   How the Substance of Inofin's Lending Business Changed, 2004-2009**

39.   During 2004, Inofin and its principals began using investor money for lending activities other than subprime auto loan financing.  Specifically, Cuomo and Mann established multiple legal entities, owned by themselves, for the purpose of purchasing one used car auto dealership, starting up three others, and engaging in commercial and residential property development in Massachusetts and Florida.

*i.    The Used Car Dealerships and Commercial Real Estate Entities*

40.   In the summer of 2004, Cuomo and Mann established four corporations, three in Massachusetts and one in Rhode Island, for the purpose of owning and running their own used car dealerships.  As established, Cuomo and Mann were the stockholders, officers and directors of these entities.  They called these entities the "Drive USA stores" (collectively, the "Drive entities").

41.   In the same time frame, Cuomo and Mann also established three limited liability

9

companies, two in Massachusetts and one in Rhode Island, for the purpose of purchasing real estate and developing the commercial dealership facilities.  As established, Cuomo and Mann were the managers and officers of these entities.

42.  Cuomo and Mann established Drive USA 1, Inc. ("Drive 1") as a Massachusetts corporation for the purpose of purchasing and operating a used car dealership in Raynham, Massachusetts.  This dealership rented its Raynham property from a third party.

43.  Cuomo and Mann established Drive USA 2, Inc. ("Drive 2") as a Massachusetts corporation for the purpose of starting up a used car dealership in Springfield, Massachusetts. They also established Prime Real Estate Associates 2, LLC ("Prime 2"), a Massachusetts limited liability company, for the purpose of acquiring the land and developing the dealership.

44.  Cuomo and Mann established Drive USA 3, Inc. ("Drive 3") as a Rhode Island corporation for the purpose of purchasing and operating a used car dealership in Providence, Rhode Island.  They also established 895 Elmwood Holdings, LLC ("Elmwood or Prime 3"), a Rhode Island limited liability company, for the purpose of acquiring the land and developing the dealership.

45.  Cuomo and Mann established Drive USA 4 ("Drive 4") as a Massachusetts corporation for the purpose of starting up a used car dealership in Worcester, Massachusetts.  They also established Prime Real Estate Associates 4, LLC ("Prime 4"), a Massachusetts limited liability company, for the purpose of acquiring the land and physical property of the dealership.

46.  With respect to the reciprocal Drive and Prime entities in Springfield, Providence and Worcester, the organizational concept required that the Drive entities earn enough money to pay interest and principal on loans from Inofin and also pay rent to the Prime entities.  In turn, the Prime entities would use the rent payments to pay interest and principal on their loan obligations

to Inofin.

47.   The organizational concept, however, did not work out as conceived for each of these ventures.  For example, using money borrowed from Inofin, Prime 4 purchased a parcel of real property in Worcester in 2005 for approximately $1 million.  Between January 2006 and December 2009, Inofin either loaned or guaranteed additional loans to Prime 4 in the amount of $3 million for property development.  No dealership has ever opened at this location and the property sits idle today.  Prime 4 has never received any rent payments to pay down its $4 million in loans.

   ii.   *The Residential Property Acquisition and Development Business*

48.   In February 2004, Cuomo and Mann also formed Prime Real Estate Associates, LLC ("Prime Residential Real Estate"), a Massachusetts limited liability company, for the purpose of acquiring and developing residential real estate.  In January 2005, Cuomo and Mann formed Prime Construction, LLC ("Prime Construction"), a Massachusetts limited liability company, for the purpose of building residential structures.

49.   In 2004, Prime Residential Real Estate purchased residential real estate lots in Plymouth, Massachusetts for approximately $1.4 million.  In 2005, Prime Residential Real Estate purchased residential real estate lots in Kingston, Massachusetts as well as a condominium in Naples, Florida for approximately $1.1 million.

   iii.   *Use of Inofin Investor Funds*

50.   Cuomo and Mann funded the establishment of their new businesses entirely with Inofin investor money.  By the end of 2005, Inofin had lent the Drive and Prime entities approximately $12.2 million of investor money.  At the time, these Inofin receivables represented approximately a third of Inofin's total assets.  That is, one out of every three dollars invested with

Inofin was going not to subprime auto lending, but instead to commercial loans extended to the businesses started by Cuomo and Mann.

51. Each year thereafter, Inofin lent more money to the Drive and Prime entities. By the end of 2006, Inofin had lent the Drive and Prime entities approximately $12.9 million, which represented twenty six percent of Inofin's assets. By the end of 2007, Inofin had lent the Drive and Prime entities approximately $14.7 million, which represented twenty seven percent of Inofin's total assets. By the end of 2008, Inofin had lent the Drive and Prime entities approximately $17 million, which represented twenty seven percent of Inofin's total assets. By the end of 2009, Drive and Prime entities owed Inofin approximately $25.5 million, which represented forty-four percent of Inofin's total assets.

52. In 2004, Inofin's loans to the Prime and Drive entities were made at the rate of fifteen percent per year. At the end of 2006, Inofin, through Cuomo and Mann, lowered the rate of interest on these loans to twelve percent per year.

53. The principal place of business of all of the Prime entities was located at 55 Accord Drive, Rockland, Massachusetts — the same location as Inofin's headquarters. George was responsible for keeping the books and records of the Prime entities.

54. Although the Drive entities had principal places of business at the locations of their physical dealerships, George acted as chief operating officer of these entities and had unfettered access to and control of the Drive books and records. In addition, as Inofin's chief operating officer and chief financial officer, George was responsible for the record-keeping documenting Inofin's loans to these entities.

iv. *Conflicts of Interest and Risks*

55. Cuomo and Mann's use of investor money for their own business ventures represented a

substantial conflict of interest. As officers of Inofin and owners of the Drive and Prime entities, Cuomo and Mann sat on both sides of the lending transactions, free to raise or lower borrowing amounts or interest rates as suited their individual interests.

56. Cuomo and Mann's ownership of the Drive and Prime entities also created a "heads they win, tails you lose" position for Inofin and its investors. If the Drive and Prime entities were successful and able to repay Inofin loans, then Cuomo and Mann, as owners of these entities, held profits for their own enrichment. If the Drive and Prime entities failed and were unable to repay the Inofin loans, Inofin and its investors lost the money that Cuomo and Mann lent to the Drive and Prime entities on their behalf.

57. In addition, the business of starting and operating four brand new auto dealerships represented a substantially different set of risks than Inofin's core business of purchasing subprime auto loans. The business of commercial and residential real estate speculation and development also represented a substantially different set of risks than Inofin's core business. Instead of having a large pool of loans to a geographically diverse subprime lending base of thousands of borrowers over several states, Cuomo and Mann bet investor money on four new car dealerships and some commercial and residential properties. Although Inofin had significant experience in the subprime auto lending market since 1994, it had never operated a used car dealership or a real estate development business. In Inofin's retail installment contracts, it required borrowers to pay high interest rates, typically twenty percent, and also to repay the loan in weekly payments of interest and principal. On the loans to the Drive and Prime entities, Cuomo and Mann made loans at fifteen (later reduced to twelve) percent and allowed these entities to make interest-only payments indefinitely. In order to maximize Inofin's return on purchasing retail installment contracts, Inofin required the dealerships to agree to a fifteen

percent hold back and a twenty percent acquisition fee. Neither of these protections existed in the loan transactions between Inofin and the Drive and Prime entities.

## C. Representations to Investors Made By Inofin and Its Principals

58. At the company's inception in 1994, Inofin began its fund raising activities through the offer and sale of securities to the friends and family of Cuomo and Mann. By 2003, however, Inofin was distributing its securities well beyond Cuomo and Mann's immediate friends and family. During 2003, Inofin paid six sales agents, including Affeldt, the tax attorney in Maryland, over $180,000 in securities sales commissions. Inofin's records indicate that, by 2005, the company was sending investor solicitations to prospective investors in Virginia, Kentucky, Colorado, New York, New Jersey, Florida, Maryland, and Pennsylvania.

59. From 2004 through February 2010, the process of investing in Inofin consisted of three steps. First, investors would speak directly with Cuomo or Mann. Second, investors would be sent an Investor Package, which, at minimum included an "Executive Summary," as well as other investor communications, discussed below, that changed over time. Third, if the investor decided to invest, Inofin provided the investor with a Promissory Note and a Loan Agreement, which made further representations and warrants on behalf of Inofin.

### i. Direct Communications with Investors

60. In their direct communications with investors, Cuomo and Mann told most investors that Inofin was solely in the business of auto sales financing for subprime borrowers.

61. Cuomo and Mann told approximately five or six close family and friend investors about the dealerships or the property development businesses as a matter of casual conversation.

62. Cuomo and Mann also told approximately five large investors about the dealerships or property development businesses. These preferred investors typically received the secured

interests described in paragraph 37 above, which ensured that their preferred investments were tied to actual car loans, as opposed to the unsecured investors whose investments were subject to the risk of all of Inofin's lending activity.

63.   Other than this handful of close family or friends and the preferred investors, all other Inofin investors were never told by Cuomo or Mann that Inofin did anything other than motor vehicle financing for subprime borrowers.  These investors were also never told about the possibility of a secured interest or the fact that Inofin had extended such security to other investors.

64.   In direct communications with investors, Cuomo told investors that Inofin was licensed to conduct motor vehicle finance activities by the Massachusetts Division of Banks.

65.   To induce investors to invest with Inofin, Cuomo also told investors that Inofin could pay them interest rates of nine to fifteen percent because:

    a.   Inofin lent money to subprime borrowers at much higher rates of approximately twenty percent;

    b.   Inofin held back the first fifteen percent of every loan and held it as security until the entire portion of Inofin's loan was paid;

    c.   Inofin charged dealers an acquisition fee of approximately twenty percent, which it collected on the front end of the loan; and

    d.   Inofin required dealers to guarantee payment of the loans.

66.   Mann also induced investors in direct communications by explaining the high interest rates on the subprime auto loans and the terms under which they were acquired from Inofin's dealer network.

67.   Both Cuomo and Mann also induced investors by touting Inofin's business model, motor vehicle financing in the subprime market, as successful and profitable.

68.   Mann and Cuomo also knew that each investor, as a matter of course, would receive Inofin's Investor Package.

69. From at least 2005 through 2010, Cuomo and Mann knowingly or recklessly misled investors through their direct representations by stating that Inofin's business model consisted of auto loan financing to subprime borrowers with all of its advantageous lending aspects, but omitting to state the following material facts, among others: Inofin loaned approximately one-third of investor money to non-auto loan businesses; these non-auto loans were made to start auto dealerships and commercial and residential real estate projects that had substantially different markets and risks than the subprime auto loan market; the non-auto loans were extended in self-interested transactions to businesses owned by Cuomo and Mann; the rates of interest and payment terms on these non-auto loans were substantially and materially different than the subprime auto loans purchased by Inofin; and these non-auto loans did not have any of the holdback or acquisition fee features designed to protect investors' investment funds.

70. From at least 2006 through 2010, Cuomo and Mann knowingly or recklessly misled investors through their direct representations by stating that Inofin's business model was successful and profitable, but omitting to state the further material facts, among others: that, as explained in following section describing the scheme to defraud, Inofin's loans to the failing Drive entities were causing Inofin to suffer substantial losses and accumulate substantial deficits, resulting in Inofin's negative net worth and progressively deteriorating financial condition.

71. From at least 2006 through 2010, Cuomo and Mann knowingly or recklessly misled investors through their direct representations by stating Inofin was licensed to conduct motor vehicle finance activities by the Massachusetts Division of Banks, but omitting to state the further material facts, among others: that, as explained in following section describing the scheme to defraud, Inofin held and maintained its license from the Division of Banks through a fraudulent scheme to present the Division with false and misleading financial information about

16

Inofin.

72.   From at least July 2007 through 2010, Cuomo and Mann knowingly or recklessly misled investors through their direct representations by stating that Inofin's business model was successful and profitable, but omitting to state the further material facts, among others:  that, as explained in the following section describing the scheme to defraud, that Inofin was selling portions of its subprime auto loan pool at a substantial discount in order to stave off ever-increasing cash shortages at the company.

ii.   *Investor Packages and the Executive Summary*

73.   Either before or after a prospective investor spoke directly with Cuomo or Mann, Inofin would send prospective investors, by mail, facsimile, electronic mail, or some other means of interstate commerce, an Investor Package.  This Investor Package included, at a minimum, an Executive Summary.

74.   The content of the Executive Summary was a collective effort of Cuomo, Mann, and George.  During the period 2004 through 2010, Cuomo, Mann, and George were aware of the contents of the Executive Summary as it was sent to prospective investors.

75.   From at least 2005 through the spring of 2008, George, as operations officer, held the responsibility of sending out investor packages and responding to investor questions in the absence of or following first communications with Mann and Cuomo.  Starting in the spring of 2008, George delegated her investor relations responsibilities to a subordinate Inofin employee, J.G.  George trained J.G. to send out Investor Packages and respond to investor inquiries, as had been her responsibility prior to that time.

76.   Overall, the Executive Summary characterized Inofin as a company that has been engaged solely in the business of motor vehicle sales financing in the subprime lending market

since 1994. The Executive Summary contained no disclosures about the Drive or Prime entities or the money Inofin loaned to them.

77. The Executive Summary also echoed the representations made directly by Cuomo and Mann, including:

> a.   Inofin holds in good standing a lending license from the Massachusetts Division of Banks;
>
> b.   Inofin's loans to subprime borrowers carry interest rates comparable to credit cards;  and
>
> c.   Inofin's loans to subprime borrowers are guaranteed by the participating dealers.

78. The Executive Summary also contained a section called "Risk Factors," which mimics a boilerplate securities offering document. This section does not disclose any risks associated with Inofin loans to the Drive and Prime entities.

79. The Risk Factor section, the Executive Summary stated that Inofin minimized investor risk by retaining "100% of the Right, Title and Interest" of the retail installment contracts. The Executive Summary contained no disclosures concerning the granting of secured interests over sections of the auto loan pool to preferred investors.

80. From at least 2005 through 2010, Cuomo, Mann, and George, through the use or communication of the Executive Summary sent to investors, knowingly or recklessly misled investors by stating Inofin's business model as auto loan financing to subprime borrowers with all of its advantageous lending aspects, but omitting to state the following material facts, among others:  Inofin loaned approximately one third of investor money to non-auto loan businesses; these non-auto loans were made to start auto dealerships and commercial and residential real estate projects that had substantially different markets and risks than the subprime auto loan market; the non-auto loans were extended in self-interested transactions to businesses owned by Cuomo and Mann; the rates of interest and payment terms on these non-auto loans were

substantially and materially different than the subprime auto loans purchased by Inofin; and these non-auto loans did not have any of the holdback or acquisition fee features designed to protect investors' investment funds.

81. From 2006 through 2010, Cuomo, Mann, and George, through the use or communication of the Executive Summary sent to investors, knowingly or recklessly misled investors by stating Inofin holds in good standing a lending license from the Massachusetts Division of Banks, but omitting to state the following material facts, among others: that, as explained in following section describing the scheme to defraud, Inofin held and maintained its license from the Division of Banks through a fraudulent scheme to present the Division with false and misleading financial information about Inofin.

82. From at least 2005 through 2010, Cuomo, Mann, and George, through the use or communication of the Executive Summary sent to investors, knowingly or recklessly further misled investors by stating that Inofin minimizes investor risk by retaining "100% of the Right, Title and Interest" of the retail installment contracts, but omitting to state the material fact, among others:  that Inofin had granted approximately five favored investors security interests in its pool of retail installment contracts.

83. From at least July 2007 through 2010, Cuomo, Mann, and George, through the use or communication of the Executive Summary sent to investors, knowingly or recklessly further misled investors by stating that Inofin minimizes investor risk by retaining "100% of the Right, Title and Interest" of the retail installment contracts, but omitting to state the material fact, among others:  that, as explained in the following section describing the scheme to defraud, Inofin was selling portions of its subprime auto loan pool at a substantial discount to stave off ever increasing cash shortages at the company.

*iii.   The "Inofin Return on Investment" Device*

84.   Sometime in 2008, George created a device specifically designed for use in explaining to investors, in detail, how Inofin's lending activities "afford the ability to supply its lenders with competitive rates of return for their loans to the company."

85.   The device was a one-page document entitled, "Inofin Loan Return on Investment."

86.   The document first highlighted the basics of "How does it work?" This section explained that, in Inofin's purchase of retail installment contracts, Inofin held back a 15 percent reserve, charged the dealer an acquisition fee, and collected all of its principal, interest and fees on the loan before paying any portion of the dealer reserve.

87.   The device then set forth a "Purchase Sample" that explained Inofin's return on the purchase of a consumer retail installment contract with a principal balance of $10,000.

88.   At the end of the sample scenario, the device calculated "Inofin's Return on Investment." The device showed that Inofin earned a "return rate" of 72.74 percent and an "annualized return rate" of 27.45 percent on its investment.

89.   George prepared the "Inofin Loan Return on Investment" device knowing or in reckless disregard of the fact that it would be used for the purpose of explaining to new and existing investors how Inofin could afford to pay investor rates of return.

90.   Consistent with this purpose, George distributed the document to Cuomo and J.G. for the purpose of explaining the Inofin investment.  Inofin also incorporated the document in its Investor Package and sent it to investors.  For example:

        a.   On Friday, October 30, 2009, Inofin sent the device as part of an investor package to prospective investor R.T. by email.

        b.   On Thursday, February 11, 2010, Inofin sent the device as part of an

investor package to prospective investor J.L. by email.

91. From at least 2008 through 2010, Cuomo, Mann, and George knowingly or recklessly defrauded investors through the employment of the "Inofin Loan Return on Investment" device with investors.

92. From at least 2008 through 2010, Cuomo, Mann, and George, through the use or communication of the "Inofin Loan Return on Investment" device, knowingly or recklessly misled investors by stating that Inofin generates income to pay investors through the subprime auto loan financing business model and all of its advantageous aspects, but omitting to state the following material facts, among others: Inofin loaned approximately one third of investor money to non-auto loan businesses; these non-auto loans were made to start auto dealerships and commercial and residential real estate projects that had substantially different markets and risks than the subprime auto loan market; the non-auto loans were extended in self-interested transactions to businesses owned by Cuomo and Mann; the rates of interest and payment terms on these non-auto loans were substantially and materially different than the subprime auto loans purchased by Inofin; and these non-auto loans did not have any of the holdback or acquisition fee features designed to protect investors' investment funds.

93. From at least 2006 through 2010, Cuomo, Mann, and George, through the use or communication of the "Inofin Loan Return on Investment" device, knowingly or recklessly misled investors by stating the Inofin generates income to pay investors through the subprime auto loan financing business model and all of its advantageous aspects, but omitting to state the following material facts, among others: that, as explained in following section describing the scheme to defraud, Inofin's loans to the failing Drive entities were causing Inofin to suffer substantial losses and accumulate substantial deficits, resulting in Inofin's negative net worth and

21

progressively deteriorating financial condition.

94.  From at least 2008 through 2010, Cuomo, Mann, and George, through the use or communication of the "Inofin Loan Return on Investment" device, knowingly or recklessly misled investors by stating that Inofin's purchase of subprime auto loans generated returns of 72 percent and annualize returns of 27 percent, but omitting to state the further material fact, among others: that, as explained in detail below, Inofin sold off substantial portions of its auto loan portfolio at a discount in order to solve ever increasing cash shortages at the company.

iv.  *Investor Letter and Investment Scenarios*

95.  From at least mid-2006 through the end of 2007, Inofin also sent investors an "Investor Letter" and two Investment Scenarios that explained Inofin's options of receiving monthly cash payments or reinvesting monthly interest payments.

96.  The Investment Letter, which was sent on behalf of Cuomo and Mann, was addressed to "Our Future Investor."  The letter told investors that Inofin is "a proven, profitable investment opportunity."  Moreover, the letter told investors that Inofin's investment opportunity offered investors "a fixed interest rate, which guarantees a profit" to the investor.

97.  The investment scenarios likewise characterized the future interest payments as "guaranteed profit," in text that was bold and underlined.

98.  From mid-2006 through the end of 2007, Cuomo, Mann, and George, either directly or indirectly, knowingly or recklessly misled investors through use or communication of the Investment Letter by stating that Inofin's business model was a proven, profitable investment opportunity, but omitting to state the material fact, among others:  that, as explained in a following section on the scheme to defraud, Inofin's loans to the failing Drive entities were causing Inofin to suffer substantial losses and accumulate substantial deficits, resulting in

Inofin's negative net worth and progressively deteriorating financial condition.

99.  From mid-2006 through the end of 2007, Cuomo, Mann, and George, through the use or communication of the Investment Letter and investment scenarios, knowingly or recklessly made the untrue statement of material fact that interest payments were "guaranteed profit." In fact, interest payments were not guaranteed at all.

*v.    The Loan Agreement and Promissory Note*

100.  In the event potential investors decided to invest, Inofin would send every investor two documents: a Loan Agreement and a Promissory Note.

101.  The Loan Agreement, which was signed by the investor and Inofin, stated that Inofin shall use the invested money solely for the purpose of funding subprime auto loans from car dealers.

102.  The Loan Agreement also contained a set of representations and warranties made by Inofin. As part of this set, Inofin stated that "[i]n order to induce" the investor to invest, Inofin represents and warrants that the company "has obtained and shall hereafter possess all such . . . licenses as are necessary to enable it to conduct its business."

103.  From at least 2005 through 2010, Cuomo, Mann, and George, through the representations in the Loan Agreement, knowingly or recklessly made the untrue statement of material fact that Inofin would use investor money "solely" for the purpose of motor vehicle sales financing activities. In fact, Inofin intended to and did use approximately one third of investor money for the non-auto loan lending activities detailed above.

104.  From at least 2006 through 2010, Cuomo, Mann, and George, through the representations in the Loan Agreement, knowingly or recklessly misled investors by stating that Inofin obtained and would thereafter possess all necessary licenses to conduct its business of subprime auto loan

financing, but omitting to state the material fact that, as described below, Inofin held and maintained its license from the Division of Banks through a fraudulent scheme to present the Division with false and misleading financial information about Inofin.

vii.    *Reinforcement of Misrepresentations to Existing Investors*

105.    Since at least 2004, Inofin has had investors whose monthly interest amounts were to be applied to their principal balance, automatically reinvesting their gains.

106.    Inofin used newsletters to comfort investors about their Inofin holdings.  For example, in January 2009, Cuomo sent out an Inofin letter to all investors by use of the mails or some means or instrumentality of interstate commerce.  Cuomo addressed the letter to "Valued Investor" and purported to address investor anxieties that had been expressed to him concerning the safety of investing with Inofin in light of the recent failure or takeover of Wall Street investment firms.

107.    In the letter, Cuomo stated that he was writing "to assure [the Valued Investor] what Inofin *is* and what Inofin *is not.*"  In describing what Inofin "is," Cuomo stated that "Inofin is a private company that provides lending to individuals through qualified dealerships for the specific purpose of purchasing used automobiles.  Your investment with Inofin is utilized to fund these automobile loans and the subsequent returns originate from our base of loan receivables — weekly car payments — over what is typically a three-year period."  This letter contained no disclosure of the outstanding loans to the Drive and Prime entities.

108.    Cuomo further stated, "We will only advance your investment toward furthering *our own* business model, which has been successful for fifteen years."

109.    Cuomo knowingly or recklessly misled investors through communication of this investor letter by stating that Inofin's business model consists of auto loan financing to subprime borrowers, but omitting to state the following material facts, among others:  Inofin loaned

24

approximately one-third of investor money to non-auto loan businesses; these non-auto loans were made to start auto dealerships and commercial and residential real estate projects that had substantially different markets and risks than the subprime auto loan market; the non-auto loans were extended in self-interested transactions to businesses owned by Cuomo and Mann; the rates of interest and payment terms on these non-auto loans were substantially and materially different than the subprime auto loans purchased by Inofin; and these non-auto loans did not have any of the holdback or acquisition fee features designed to protect investors' investment funds.

110.   Cuomo also knowingly or recklessly misled investors through communication of this investor letter by stating that Inofin's business model had been successful for fifteen years, but omitting to state the following material facts, among others:  that, as explained in following section describing the scheme to defraud, for the past two years Inofin's loans to the failing Drive entities were causing Inofin to suffer substantial losses and accumulate substantial deficits, resulting in Inofin's negative net worth and progressively deteriorating financial condition.

*viii.   Money or Property Obtained By Means of Misrepresentations to Investors*

111.   Through the use of the fraudulent misrepresentations described above, from 2004 through 2010, Cuomo, Mann, and George obtained millions of dollars in investor funds.  By the time of Inofin's involuntary bankruptcy proceedings, Inofin owed its investors over $69 million.

112.   For example, at the end of 2007, investor B.G called Inofin and spoke directly to Cuomo about Inofin and subsequently received through the mail an Investor Package, including the Executive Summary, the Investment Letter and the investment scenarios.  In the direct conversation with B.G., Cuomo represented, among other things, that Inofin was in the business of motor vehicle sales financing for subprime borrowers and that the business was thriving in the economic downturn.  Neither Cuomo nor the Investor Package materials disclosed any facts

about the Inofin loans to Prime and Drive.  Neither Cuomo nor the Investor Package materials

disclosed any facts concerning the financial deterioration of Inofin or its discounted sales of

portions of Inofin's auto loan portfolio.  Following these misleading representations made by

Cuomo and in the Investor Package, B.G. and his wife invested $265,000 with Inofin.

113.  As a further example, in October 2005, R.T. invested approximately $41,000 after being

told by Inofin that the company was engaged solely in the business of motor vehicle sales

financing to subprime borrowers.  In December 2008, Mann represented to R.T. that for every $1

dollar invested in Inofin, the company could extend $1.54 in new car loans.  When R.T.

questioned how this could be done, Mann showed R.T. the "Inofin Loan Return on Investment"

device, which had been created by George in 2008.  In October 2009, R.T. added approximately

$7,700 to his investment in Inofin.  In November 2009, R.T.'s relative W.T. invested

approximately $533,000 in Inofin.

114.  As a further example, in 2006, investor J.T. spoke with Mann before investing in Inofin.

As part of the investment pitch, Mann told J.T. that Inofin was in the sole business of motor

vehicle sales financing and that the company was profitable.  Following these misleading

misrepresentations, J.T. invested $1 million in April 2006 and added to his investment through

2009.  Following the misleading misrepresentations, J.T. also invested money in Inofin on behalf

of family members.

115.  As a further example, prior to investing approximately $100,000 in March 2008, investor

E.B. met with Cuomo and took a tour of Inofin's corporate offices.  As part of the investment

pitch, Cuomo told E.B. that Inofin was in the sole business of motor vehicle sales financing for

subprime borrowers.

116.  As a further example, on or about March 17, 2009, Inofin sent investor K.W. an Investor

Package, which included the Executive Summary and the "Inofin Loan Return on Investment" device. Following receipt of these materials, K.W. invested approximately $100,000 in Inofin.

117.  As a further example, on or about January 7, 2010, Inofin sent investor J.E. an Investor Package, which included the Executive Summary and the "Inofin Loan Return on Investment" device. Following receipt of these materials, J.E. invested approximately $20,000 in Inofin on or about March 25, 2010.

**D.    Inofin's Sales Agents:  Affeldt and Kevin Keough**

118.  In addition to the direct sales by Inofin principals, Inofin used sales agents and promoters to attract investors.  Cuomo's college roommate, Kevin Keough, and Keough's long time brokerage customer, friend and tax attorney David Affeldt, were two of the more successful promoters.

119.  Kevin Keough invested over $50,000 in Inofin.  He recommended the Inofin investment opportunity to some of his brokerage customers including Affeldt.  As part of the recommendation, Kevin Keough provided these clients with Cuomo's contact information so that they could invest.

120.  Kevin Keough did not want to be compensated directly for his referrals because he was at all relevant times a registered representative for a broker-dealer.  To address this concern, Inofin compensated Kevin Keough's wife Nancy Keough for Kevin Keough's referrals.  Sometime in approximately 2003, Nancy Keough and David Affeldt entered into an oral agreement to "split 50/50" Inofin referral fees for any investors brought to Inofin by either the Keoughs or Affeldt. This arrangement yielded approximately 50 investors for Inofin and over $500,000 in referral fees for Affeldt and the Keoughs between 2004 and 2009.

121.  Affeldt also made an initial $50,000 investment in Inofin and then began to introduce

Inofin to his family members, who also invested.  Affeldt solicited most investors through his

work as a Maryland tax attorney.  During the period 2003 through 2010, Affeldt had over 1000

clients for whom he provided tax advice, retirement planning, trust and estate planning, and tax

return preparation services.  During his consultations with clients, Affeldt discussed the

importance of setting aside money for retirement purposes.  Clients would routinely ask Affeldt

where they could put their money, and Affeldt would mention Inofin as an investment option for

those who were looking for a fixed instrument or set return.  Affeldt told his clients that he was

invested in Inofin and that he was receiving a 13% return and that they may receive as much as

an 11% return.  If his clients were interested, Affeldt provided them with Cuomo's contact

information and suggested that they tell Cuomo that they were a client of Affeldt's when they

called.  Inofin then paid Affeldt and Nancy Keough a referral fee based on each investor that

originated from Affeldt.

122.  Nancy Keough's efforts were not as fruitful as Affeldt's as she may have limited her

sales efforts to just co-workers, friends, and family.  Nevertheless, Inofin paid Nancy Keough

approximately $368,000 of the $500,000 in referral fees generated by the combined efforts of

Affeldt and the Keoughs during the period 2004 through 2009.  Affeldt, on the other hand,

received approximately $135,000 during the same time period.  In keeping with their agreement,

Nancy Keough, from time to time, wrote checks to Affeldt to adjust and increase his

compensation.

**E.    Inofin's Financial Deterioration and the Scheme to Defraud, 2005-2010**

123.  As set forth above, Inofin, Cuomo, Mann, and George, either directly or indirectly, all

told the company's investors that Inofin maintained a Massachusetts license to conduct its

business as a subprime auto sales finance company.  This representation appeared not only in the

company's Executive Summary but was included in the investors' Loan Agreement as a direct representation and warranty to induce each investor's commitment.

124.   Without the license to do so from the Commonwealth of Massachusetts, Inofin, whose sole corporate office was located in Massachusetts, would have no legal basis to continue operating in Massachusetts as an motor vehicle sales finance company.

125.   To maintain this license, the Massachusetts Division of Banks required that Inofin, among other things, file annually: (1) an Annual Report to the Commissioner of the Division of Banks; and (2) a License Renewal Application.

126.   In April of each year, the Division required Inofin to provide an Annual Report that included a sworn declaration of the company's net worth and adjusted net worth.  The adjusted net worth calculation required exclusion of "[a]ny asset due from officers or stockholders of the licensee or persons in which the licensee's officers or stockholders have an interest."

127.   The Division of Banks also required any entity with a negative net worth, a negative adjusted net worth, or a net loss to "[p]rovide details on the financial condition of the licensee."

128.   Furthermore, the Annual Report reminded filers that "entities licensed as a motor vehicle sales finance company must . . . . maintain an Adjusted Net Worth of at least $20,000."

129.   In September of each year, the Division required Inofin to submit a License Renewal Application.  The Division's regulations required that the application include annual financial statements that (1) have been reviewed or audited by an independent Certified Public Accountant, and (2) have been prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

130.   Through the summer of 2006, Inofin engaged the firm of S&Co. to perform an audit of its financial statements for submission to the Division of Banks.

i.   *Mounting Drive Losses, a Sham Sale, and a False Declaration of Adjusted Net Worth*

131.   In 2005, Inofin and its principals became concerned that mounting losses at the Drive entities would adversely affect Inofin's financial statements and cause Inofin to be out of compliance with the Division of Banks's net worth requirements.  By the end of 2005, the Drive entities had collectively racked up over $3.6 million in net losses.  As a result, Cuomo, Mann, and George schemed to provide the Division of Banks with false and misleading financial information as a means to maintain Inofin's license to do business as a motor vehicle sales finance company.  As described in further detail below, this scheme continued until April 2010.

132.   During 2005, Cuomo and Mann engineered a "sale" of the Drive entities to Mark Walsh ("Walsh") a long-time friend of Mann and, at the time, an employee of Inofin and an Inofin investor.

133.   The sale to Walsh was a sham.  From the date of the sale through 2010, Cuomo and Mann continued to exercise management and financial control over the Drive entities through George, who acted as their Chief Operating Officer, and Mann who oversaw George's management.  While Walsh performed some Drive duties such as attending used car auctions, he was otherwise an absentee owner.  George and Mann exercised the real management and control of the Drive entities.  Moreover, the Drive entities were completely under the financial control of Cuomo and Mann through Inofin, which was the Drive entities' principal financier.  Without the financial support of Inofin, the Drive entities would have suffered a swift and utter collapse.

134.   Cuomo and Mann engineered this sham sale for the purpose of eliminating consideration of the Drive entities from the preparation of Inofin's financial statements.

135.   In addition, on March 21, 2006, Cuomo, on behalf of Inofin, submitted its Annual Report to the Massachusetts Division of Banks, swearing that its net worth, as of December 31, 2005,

was $774,884. Cuomo submitted this sworn declaration knowing or recklessly disregarding the fact that Inofin's books and records had been manipulated to meet this requirement.

136. In submitting this Annual Report, Cuomo also knowingly or recklessly submitted a falsely inflated adjusted net worth calculation for Inofin. On the Annual Report form, directly above the entry for Adjusted Net Worth, the form states the computation of Adjusted Net Worth should omit: "Any assets due from officers or stockholders of the licensee or persons in which the licensee's officers or stockholders have an interest." Contrary to these directions, Cuomo reported an Adjusted Net Worth of $709,588 that failed to omit the receivables due from the Prime entities, which Cuomo and Mann owned directly, and the Drive entities, which Cuomo and Mann owned indirectly through their control of these entities despite the sham ownership of Walsh. At the time, the Drive entities owed Inofin approximately $6 million, and the Prime entities owed Inofin approximately $6 million. Accordingly, Cuomo knowingly or recklessly submitted an Adjusted Net Worth to the Division of Banks that was falsely inflated by approximately $12 million.

*ii. Year-End 2005, Inofin Pressures S&Co. To Exclude The Financial Effect of Drive Losses*

137. For the audit of Inofin's 2005 year-end financial statements, Inofin pressed S&Co. to provide an audit opinion on a set of entity-only financial statements that excluded the financial accounts of the Drive and Prime entities. Citing a regulation of the Division of Banks, Inofin claimed that it need not consolidate its financial statements for regulatory approval. In these financial statements, Inofin's loans to Drive and Prime sat on Inofin's balance sheet as an asset listed as Notes Receivable from Related Parties.

138. S&Co. learned of the sale of the Drive entities (without being informed that it was a sham), but informed Cuomo and Mann that in order to issue an opinion that Inofin's financial

statements were GAAP-compliant, S&Co. would require consolidation of the Drive and Prime accounts. S&Co. further informed Cuomo and Mann that even if the financial statements remained unconsolidated, they would require a determination of the need, if any, for a valuation allowance on the Drive loans.

139. Cuomo and Mann insisted on an audit of the unconsolidated financial statements.

140. As part of the audit procedures, S&Co. requested that Inofin provide 2005 year-end as well as July 31, 2006 balance sheets for the Drive entities. On September 20, 2006, Inofin's controller emailed those financial statements to S&Co., copying Cuomo and Mann on the email.

141. After reviewing the Drive balance sheets, S&Co. further informed Cuomo and Mann that the firm believed that there should be an impairment taken on the Drive loans. Inofin and its principals disagreed.

142. S&Co. and Inofin ultimately resolved their disagreements over the consolidation and receivable impairment issues by having S&Co. issue an audit opinion that noted a scope limitation and a departure from GAAP.

143. S&Co.'s scope limitation noted that Inofin's unconsolidated financial statements contained notes receivable from related entities for which it could not determine the need for a valuation allowance. In a note to the financial statements, S&Co. also required Inofin to disclose the total amount of receivables due from Drive and Prime, $13 million, as well as the fact that the Drive and Prime entities had a cumulative loss of $3.5 million for the year end 2005.

144. S&Co.'s audit report also noted a departure from GAAP. In S&Co.'s professional opinion, in order to comply with GAAP, Inofin's financial statements would have to consolidate the financial accounts of Drive and Prime, which were owned or controlled by Inofin's principal officers.

145. In September 2006, Inofin submitted its License Renewal Application with these unconsolidated financial statements along with S&Co.'s GAAP-exception audit opinion. The Division of Banks rejected this submission as failing to comply with the requirement that the financial statements be prepared in conformance with GAAP.

iii.    *2007 Submission of Inflated Adjusted Net Worth*

146. On or about April 13, 2007, Cuomo, on behalf of Inofin, submitted its Annual Report to the Massachusetts Division of Banks, swearing that Inofin's adjusted net worth, as of December 31, 2006, was $762,167. Cuomo submitted this sworn declaration knowing or recklessly disregarding the fact that he had submitted a falsely inflated adjusted net worth calculation. On the Annual Report form, directly above the entry for Adjusted Net Worth, the form states the computation of Adjusted Net Worth should omit: "Any assets due from officers or stockholders of the licensee or persons in which the licensee's officers or stockholders have an interest." Contrary to these directions, Cuomo reported an Adjusted Net Worth of $762,167 that failed to omit the receivables due from the Prime entities, which Cuomo and Mann owned directly, and the Drive entities, which Cuomo and Mann owned indirectly through their management and financial control of these entities despite the sham ownership of Mark Walsh. At end of 2006, the Drive entities owed Inofin approximately $5.6 million, and the Prime entities owed Inofin approximately $7.3 million. Accordingly, Cuomo knowingly or recklessly submitted an Adjusted Net Worth to the Division of Banks that was falsely inflated by approximately $12.9 million.

iv.    *Inofin's Outside Accountants Spell Out The Effect of Drive Losses and Get Terminated*

147. Following the Division of Banks' rejection of Inofin's License Renewal Application, Inofin engaged the Division of Banks in a discussion of what the regulatory agency would accept

as required financial statements. The Division informed Inofin that it would accept two sets of company financial statements: a set that consolidated related parties as required by GAAP, and an unconsolidated set that provided financial accounts of Inofin only.

148. During the 2007 year, Inofin engaged S&Co. to provide a review, instead of an audit, report of Inofin's 2006 year-end financial statements. The change in engagement lowered the type of assurance that would be provided by Inofin's independent, professional, outside accountants. Despite the change in engagement type, however, S&Co. once again determined that in order to issue an opinion that Inofin's financial statements were GAAP-compliant, it would require consolidation of the Drive and Prime results.

149. In addition, S&Co. informed Cuomo and Mann that a review of Inofin-only unconsolidated financial statements would require S&Co. to determine the need, if any, for a valuation allowance on the Drive loans.

150. Moreover, after reviewing the Drive entities' 2005 and 2006 financial statements, S&Co. concluded that the Drive entities were not moving toward profitability.

151. By the end of 2006, the Drive entities, according to their own financial statements, had lost $3.6 million in 2005 and another $1.5 million in 2006, for a total two-year loss of $5.1 million. Their liabilities exceeded their assets by approximately $5 million, and they owed Inofin over $5 million.

152. Inofin management gave S&Co. some "Annual Projections 2007-2010" in order to suggest that the Drive entities would be able to repay the Inofin loans. These projections claimed that the Drive entities, which had just collectively lost $1.5 million in 2006, would produce net income of $1.7 million in 2007. These projections also asserted that the Drive entities would continue to generate increasing amounts of net income through 2009: $2.3

34

million in 2008 and $2.7 million in 2009.  Based on the consistent history of Drive losses, however, S&Co. concluded that the Drive entities would not generate sufficient cash flow to repay the Inofin loans.

153.  In June 2007, S&Co. told Inofin, Cuomo and Mann that, unlike the year before, it would insist that Inofin write-down the value of the Drive receivables by $5 million.  This write-down would have resulted in a $5 million loss on Inofin's income statement for the year ended December 31, 2006 and a reduction of Inofin's assets of the same amount as of December 31, 2006.

154.  Furthermore, S&Co. informed Inofin, Cuomo and Mann that it would need to obtain comfort that Inofin would be able to continue its operations in light of the Division of Banks' regulations regarding net worth.

v.   *Replacing Inofin's Outside Accountants with "Magoo" (Summer 2007)*

155.  Rather than accept the reality of the situation as explained through Inofin's professional, independent accountants, Cuomo, Mann, and George set out to find a "local small one man type CPA" who would issue review reports acceptable to the Division of Banks on company financials that would hide Inofin's insolvency by not consolidating the Drive losses and by not writing-down the Drive receivables to reflect the enormous risk that these non-performing entities would never be able to repay Inofin's loans.

156.  They found their accountant in R.T., a man who George referred to as "Magoo" – a reference to the severely nearsighted cartoon character.  After being engaged by Inofin in July 2007, R.T. met with S&Co. at the start of his engagement.  S&Co. informed R.T. that it was being replaced as a result of a dispute over the way Inofin wanted to account for the money that the Drive entities owed Inofin.  S&Co. also informed R.T. that the collectability of the entire

balance was in question and that had S&Co. continued as Inofin's outside, independent accountant it would have required a "sizable reserve" against the Drive entities' receivable.

157.   Inofin had R.T. review two sets of Inofin financial statements:  one consolidated and one unconsolidated.  Cuomo, Mann, and George designed both sets of financial statements to hide the financial effect of the Drive entities' performance on Inofin's financial statements.

158.   Inofin's "consolidated" financial statements purported to consolidate Inofin's related parties, but consolidated only the Prime entities and left the Drive entities unconsolidated.  The accounting effect of this preparation excluded the Drive entities' $5 million in losses, hiding the fact that Inofin had a negative net worth of at least $4 million.

159.   Inofin's unconsolidated financial statements showed the loans to the Drive entities as Notes Receivable from Related Parties, an asset on Inofin's balance sheet.  These financial statements, however, did not reflect any valuation allowance or impairment for these loans. S&Co.'s review of these same Drive receivables caused them to insist that Inofin to take a valuation allowance or impairment of $5 million, which would have similarly caused Inofin to reflect a negative net worth of at least $4 million.

160.   During the course of review procedures, R.T. asked Cuomo for a copy of the financial statements for each of the Drive entities for 2005 and 2006.  Cuomo answered this request by telling R.T. that Inofin could not provide these financial statements because Inofin had sold these entities in 2005.  This statement was not true because (1) Inofin had previously provided Drive entity financial statements to S&Co., and (2) Cuomo knew that Inofin was in control of the Drive entities and that the sale to Walsh had been a sham.

161.   On September 10, 2007, R.T. issued a review report stating that he had performed a review of Inofin's 2006 year-end consolidated financial statements and that he was not aware of

any material modifications needed to be made for them to be in conformity with GAAP, despite the fact that the statements did not consolidate the effects of the Drive entities. With respect to consolidation of the Drive entities, R.T. noted that the Drive entities were "former variable interest entities," but that they had been "sold in 2005." In order to receive this report of GAAP-compliant consolidated financial statements, Cuomo, Mann, and George knowingly or recklessly misled R.T. by failing to inform him that the Drive entities' sale had been a sham and that they continued exercise management and financial control over these entities.

162. On the same date, R.T. issued a review report stating that he had performed a review of Inofin's 2006 year-end unconsolidated financial statements. He noted in his report that the financial statements contained a departure from GAAP as they did not reflect the consolidation of the Drive and Prime entities as required by GAAP. Instead, the financial statements simply reflected the monies owed to Inofin from Drive and Prime on the balance sheet as "Notes Receivable from Related Parties." With regard to the Drive receivables, R.T. stated in a note that he was "unable to determine through review procedures the need, if any, for a valuation allowance for these variable interest entities." In order to receive this statement in R.T.'s report disclaiming the ability to determine the collectability of the Drive loans, Cuomo, Mann, and George knowingly or recklessly misled R.T. about their knowledge of these entities' inability to repay and their ability to provide Drive financial records.

163. In September 2007, Cuomo submitted Inofin's License Renewal Application to the Division of Banks.

164. The License Renewal Application included a copy of Inofin's 2006 year-end consolidated financial statements and R.T.'s review report regarding GAAP compliance. These submitted financial statements purport to show that Inofin had total assets worth $49.8 million

and total liabilities of $49.4 million, representing a total net worth of approximately $400,000. At the time of this submission, Cuomo knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $5 million because of the failure to consolidate the losses of the Drive entities.

165.  The License Renewal Application also included a copy of Inofin's 2006 year-end unconsolidated financial statements and R.T.'s review report noting that he was unable to determine the collectability of Inofin's loans to the Drive entities. These financial statements purport to show that Inofin had total assets worth $46.9 million and total liabilities of $46.3 million, representing a total net worth of approximately $600,000.  At the time of this submission, Cuomo knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $5 million because of the Drive losses and the uncollectability of the Drive receivables owed to Inofin.

vi.   *Selling Off The Subprime Loan Pool At Discount*

166.  By mid-2007, Inofin ran short on cash to pay redeeming investors.  To solve this cash shortage, Mann, George and Cuomo engineered a scheme to sell off some of Inofin's subprime loan portfolio, the very thing they were touting to investors as the means by which Inofin could generate such great returns, at a substantial discount in order to raise cash.  Mann took the lead on this operation with the assistance of George.

167.  In 2007, Mann negotiated an arrangement with Mid-Atlantic Finance ("MAF"), a large subprime financial service lender headquartered in Clearwater, Florida.  According to the terms of the agreement, MAF purchased the retail installment contracts at an eight percent discount of the remaining principal balance.  In addition, MAF charged Inofin a broker fee of one percent of the total principal balance purchased. MAF held back approximately eighteen percent of Inofin's

payment in a "non-interest bearing non-cash account . . . to guarantee and reward the favorable performance" of the transferred retail contracts. MAF had discretion to use the holdback to satisfy any expenses or deficiency balances incurred from collection on the retail contracts. Moreover, MAF would review the holdback only quarterly to determine if there were sufficient funds to call for the release of part or all of the holdback to Inofin. Finally, Inofin agreed to "buyback" any retail contract sold to Inofin if the retail consumer failed to acknowledge the debt or make one full monthly payment within 30 days from the date of MAF's purchase.

168. Selling off portions of Inofin's subprime loan portfolio under these terms was an economically poor decision for the company. Inofin lost not only nine percent of the principal balance of each contract, but also the remaining interest due in future periods under the contract. In addition, eighteen percent of the cash Inofin was supposed to receive sat unproductively in a non-interest bearing account for months. Finally, the agreement further required that Inofin take back all of its non-performing loans, ensuring that MAF received the high quality loans and Inofin retained the lower quality, non-performing loans.

169. From July through the end of December 2007, Inofin transferred approximately $2,289,000's worth of its subprime auto loan portfolio to MAF. The signatures of Cuomo, Mann, and George appear in the contract documents. Of that amount, Inofin bought back approximately $310,000's worth of non-performing loans.

170. In the maintaining Inofin's books and records, however, George did not record the expenses associated with the sales of Inofin's loan portfolio. George collected the cash and used the money to pay investors, but did not record approximately $182,000 in discounts and fee costs. In addition, George continued to record the accruing interest of the retail auto loans that had been sold off to MAF. Accordingly, Inofin improperly recognized approximately $85,000 of

interest income, which was never received by Inofin from the retail loans sold to MAF.

171.  At the end of 2007, the Drive entities collectively lost $1.13 million.  This result represented a third consecutive year of over a million dollars in Drive losses.  The result was also approximately $2.8 million less than the net income result Inofin had projected for S&Co. during the same year.  Moreover, at the end of 2007, the Drive entities liabilities exceeded their assets by approximately $6 million, and they owed Inofin over $6 million.

172.  Nevertheless, on April 24, 2008, Cuomo submitted a sworn Annual Report to the Division of Banks certifying that Inofin's net worth was $2,068,034 knowing or recklessly disregarding the fact that this net worth was overvalued by at least $5 million because of the three years of Drive losses, the uncollectability of the Drive receivables owed to Inofin, and the failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

173.  In submitting this Annual Report, Cuomo also knowingly or recklessly submitted a falsely inflated adjusted net worth calculation for Inofin.  On the Annual Report form, directly above the entry for Adjusted Net Worth, the form states the computation of Adjusted Net Worth should omit:  "Any assets due from officers or stockholders of the licensee or persons in which the licensee's officers or stockholders have an interest."  Contrary to these directions, Cuomo reported an Adjusted Net Worth of $2,068,034 that failed to omit the receivables due from the Prime entities, which Cuomo and Mann owned directly, and the Drive entities, which Cuomo and Mann owned indirectly through their management and control of these entities despite the sham sale to Mark Walsh.  At end of 2007, the Drive entities owed Inofin approximately $6 million, and the Prime entities owed Inofin approximately $8.7 million.  Accordingly, Cuomo knowingly or recklessly submitted an Adjusted Net Worth to the Division of Banks that was falsely inflated by approximately $14.2 million.

vii.   *Keeping Magoo in the Dark*

174.   During the R.T.'s review of the 2007 Inofin financial statements, George served as R.T's first point of contact at Inofin.  As R.T. began to question the Drive receivables, George worked to keep R.T. in the dark.

175.   On August 4, 2008, George wrote to Cuomo:  "I'm working on [R.T.]'s list & I just noticed that he asked for Drive's tax returns for 2006?  He didn't ask for it last year?  There's nothing on them that doesn't match, just an odd request, I think?  Maybe he's trying to see if there was any truth to the numbers?  Hmmm.."

176.   Later the same day, in the same email chain, George wrote to Cuomo:  "I also think he wants to see who has been and is taking the losses.  I can tell him that Mark [Walsh] will not give them to us."  This suggestion was the same fabrication that Inofin had foisted on R.T. the previous year.

177.   In addition, Cuomo, Mann, and George all knowingly or recklessly failed to inform R.T. that the auto loan receivables on Inofin's year-end 2007 financial statements were artificially inflated by over $260,000 because they had not recorded the costs associated with Inofin's discounted sales to MAF.

178.   In preparation of Inofin's 2007 year-end financial statements, Cuomo, Mann, and George once again generated two sets of financial statements for R.T.'s review:  one consolidated and one unconsolidated.  As the year before, Cuomo, Mann, and George prepared these financial statements to hide the fact that Inofin's investments in the Drive entities had incurred significant losses and caused Inofin to have a negative net worth.  The consolidated financial statements again failed to consolidate the Drive entities' losses.  Further, the unconsolidated financial statements failed to reflect any valuation allowance or impairment for the Drive receivables.

179.  On September 15, 2008, R.T. issued a review report stating that he had performed a review of Inofin's 2007 year-end consolidated financial statements and that he was not aware of any material modifications needed to be made for the statements to be in conformity with GAAP. With respect to consolidation of the Drive entities, R.T. noted that the Drive entities were "former variable interest entities," but that they had been "sold in 2005." In order to receive this report of GAAP-compliant consolidated financial statements, Cuomo, Mann, and George knowingly or recklessly misled R.T. by failing to inform him that the Drive entities' sale had been a sham and that they continued to exercise management and financial control over these entities.

180.  On the same date, R.T. issued a review report stating that he had performed a review of Inofin's 2007 year-end unconsolidated financial statements. With regard to the Drive receivables, R.T. stated in a note that he was "unable to determine through review procedures the need, if any, for a valuation allowance for these variable interest entities." In order to receive this statement in R.T.'s report disclaiming the ability to determine the collectability of the Drive loans, Cuomo, Mann, and George knowingly or recklessly misled R.T. about their knowledge of these entities' inability to repay and their ability to provide Drive financial records.

181.  In September 2008, Cuomo submitted Inofin's License Renewal Application to the Division of Banks.

182.  The License Renewal Application included a copy of Inofin's 2007 year-end consolidated financial statements and R.T.'s review report regarding GAAP compliance. These submitted financial statements purport to show that Inofin had total assets worth $56.9 million and total liabilities of $56.2 million, representing a total net worth of approximately $700,000. At the time of this submission, Cuomo knew or acted in reckless disregard of the fact that

Inofin's net worth was inflated by at least $6 million because of the failure to consolidate the losses of the Drive entities and the failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

183.   The License Renewal Application also included a copy of Inofin's 2007 year-end unconsolidated financial statements and R.T.'s review opinion noting that he was unable to determine the collectability of Inofin's loans to the Drive entities. These financial statements purported to show that Inofin had total assets worth $55 million and total liabilities of $53.1 million, representing a total net worth of approximately $1.9 million. At the time of this submission, Cuomo knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $6 million because of the Drive losses and the uncollectability of the Drive receivables owed to Inofin and the failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

*viii.   2008—$10 Million In Auto Loans Sold At Discount, Magoo Still Kept In The Dark*

184.   During the calendar year 2008, Cuomo, Mann, and George sold off five times as much of the auto loan portfolio to MAF as they had in 2007, transferring approximately $10,384,000 worth of its subprime auto loan portfolio to MAF. Of that amount, Inofin bought back approximately $1,958,000 worth of non-performing loans. Again, the signatures of Cuomo, Mann, and George appear in the contract documents.

185.   Similar to the preceding year, George did not record in Inofin's books and records the detrimental financial consequences associated with sales of Inofin's loan portfolio. George collected the cash and used the money to pay investors, but did not record approximately $778,000 in fees paid to MAF. George also continued to record approximately $1,045,000 of accruing interest on the retail auto loans that had been sold off to MAF.

186.  In addition, at the end of 2008, the Drive entities collectively lost $730,551.  This result represented a fourth consecutive year of Drive losses.  The result was also approximately $3 million less than the net income result Inofin had projected for S&Co in 2007.  The liabilities of the Drive entities exceeded their assets by approximately $7.2 million. They also owed Inofin approximately $6.5 million.

187.  Moreover, the performance of the Drive 1 store in Raynham was so bad during 2008 that Inofin and its principals closed down its operations in October.  By the end of 2008, the balance sheet of this non-operating entity reflected Inofin payables of over $4 million.  With total assets of $864,417, this non-operating entity had no ability to payback over $3 million of the amount it owed to Inofin.  As the controlling management over the Drive entities, Cuomo, Mann, and George were well aware of the Drive losses and the closing of the Drive 1 entity in Raynham.

188.  On or about March 12, 2009, Cuomo, on behalf of Inofin, submitted a sworn Annual Report to the Commissioner of Banks certifying that Inofin's net worth was $3,009,475 knowingly or recklessly disregarding the fact that this net worth was overvalued by at least $6 million because of the Drive entities' losses, the uncollectability of the Drive receivables, and the failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

189.  In submitting this Annual Report, Cuomo also knowingly or recklessly submitted a falsely-inflated adjusted net worth calculation for Inofin.  On the Annual Report form, directly above the entry for Adjusted Net Worth, the form states that the computation of Adjusted Net Worth should omit: "Any assets due from officers or stockholders of the licensee or persons in which the licensee's officers or stockholders have an interest."  Contrary to these directions, Cuomo reported an Adjusted Net Worth of $3,009,475 that failed to omit the receivables due from the Prime entities, which Cuomo and Mann owned directly, and the Drive entities, which

Cuomo and Mann owned indirectly through their management and control of these entities despite the sham ownership of Walsh. At the time, the Drive entities owed Inofin approximately $6.5 million, and the Prime entities owed Inofin approximately $10.5 million. Accordingly, Cuomo knowingly or recklessly submitted an Adjusted Net Worth to the Division of Banks that was falsely inflated by approximately $17 million.

190.   During R.T.'s work reviewing Inofin's financial statements for 2008, he became more concerned about the money owed to Inofin by Drive and Prime. Although R.T. asked some questions of George concerning these receivables, she actively worked to keep him from knowing the full extent of their collectability problems. For example, on July 9, 2009, George wrote an email to Mann summarizing her stonewalling of R.T. She wrote: "Hi just got out of a meeting with [R.T.]. He's closing in on me with the prime/drive receivables...wants to meet with this Mr. Walsh and also needs a personal financial statement from him. He asked if he had any assets and I said I'm pretty sure he does? I think he lives in Raynham but has a couple of other houses like one down south and one up north? I play dumb...I tell him I don't really deal with Mark, just his Management team on Mondays when I review their budgets for the operating line. I told him Mark deals with you guys, as you're all 'bosses.' Also, he's lined up what is owed on the houses...three over $1 Mil...oh geez..."

191.   During the course of R.T.'s work in reviewing Inofin's 2008 year-end financial statements, Cuomo, Mann, and George also knowingly or recklessly failed to disclose to R.T. that Inofin had sold off more than $10 million of its auto loan receivables without recording the costs of those transfers on Inofin's books and records.

192.   R.T. did not complete his review of Inofin's 2008 year-end financial statements before the Division of Banks' September deadline for License Renewal. Inofin therefore initially

submitted a License Renewal Application without a review report.  On or about September 29

2009, Cuomo submitted Inofin's License Renewal Application to the Division of Banks with a

copy of Inofin's 2008 year-end financial statements.  Cuomo signed these financial statements

under oath or affirmation that "the contents of the document are truthful and accurate to the best

of his knowledge and belief."  The 2008 year-end balance sheet purported to show that Inofin

had total assets worth $63.5 million and total liabilities of $60.5 million, representing a total net

worth of $3 million.  At the time of this submission, Cuomo knew or acted in reckless disregard

of the fact that Inofin's net worth was inflated by at least $6 million because of the failure to

consolidate the losses of the Drive entities, the uncollectability of the Drive receivables, and the

failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

193.  In preparation of Inofin's 2008 year-end financial statements for R.T.'s review, Cuomo,

Mann, and George once again generated two sets of financial statements:  one consolidated and

one unconsolidated.  As was done for the previous two years, Cuomo, Mann, and George

designed these financial statements to hide the substantial losses Inofin was suffering as a result

of its investments in the Drive entities.  The consolidated financial statements failed to

consolidate the Drive entities' losses.  The unconsolidated financial statements failed to reflect

any valuation allowance or impairment for the Drive receivables.

194.  On October 23, 2009, R.T. issued a review report stating that he had performed a review

of Inofin's 2008 year-end consolidated financial statements and that he was not aware of any

material modifications needed to be made for them to be in conformity with GAAP.  With

respect to the consolidation of the Drive entities, R.T. noted that the Drive entities were "former

variable interest entities," but that they had been "sold in 2005."  In order to receive this report of

GAAP-compliant financial statements, Cuomo, Mann, and George knowingly or recklessly

misled R.T. by failing to inform him that the Drive entities' sale had been a sham and that they continued to exercise management and financial control over these entities.

195.  On the same date, R.T. issued a review report stating that he had performed a review of Inofin's 2008 year-end unconsolidated financial statements.  With regard to the Drive receivables, R.T. stated in a note that he was "unable to determine through review procedures the need, if any, for a valuation allowance for these variable interest entities."  In order to receive this statement in R.T.'s report disclaiming the ability to determine the collectability of the Drive loans, Cuomo, Mann, and George knowingly or recklessly misled R.T. about their knowledge of the Drive entities' inability to repay and their ability to provide Drive financial records sufficient to assess the collectability of Inofin's loans.

196.  On October 27, 2009, George submitted both sets of the R.T.-reviewed financial statements to the Division of Banks in support of Inofin's License Renewal Application.

197.  The 2008 year-end consolidated financial statements purport to show that Inofin had total assets worth $63,365,141 million and total liabilities of $63,436,820 million, representing a negative net worth of $71,679.  At the time of this submission, George knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $6 million because of the failure to consolidate the losses of the Drive entities and the failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

198.  The 2008 year-end unconsolidated financial statements purported to show that Inofin had total assets worth $62.8 million and total liabilities of $60.4 million, representing a total net worth of $2.4 million.  At the time of this submission, George knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $6 million because of the uncollectability of the Drive receivables and the failure to record the costs associated with the

discounted sales of Inofin's loan portfolio to MAF.

ix.   *2009--Inofin's Machinations Come Home To Roost*

199.   During the calendar year 2009, Cuomo, Mann, and George continued to sell off Inofin's auto loan portfolio to MAF as they had in 2007 and 2008. During 2009, Inofin transferred approximately $9,792,000's worth of its subprime auto loan portfolio to MAF. Of that amount, Inofin bought back approximately $2,051,000's worth of non-performing loans.

200.   Similar to the preceding year, George did not record in Inofin's books and records the detrimental financial consequences associated with sales of Inofin's loan portfolio. George collected the cash and used the money to pay investors, but did not record approximately $717,000 in fees paid to MAF. George also continued to record approximately $1,558,000 of accruing interest on the retail auto loans that had been sold off to MAF.

201.   The discounted sale of the auto loan pool for immediate cash during 2009, however, was no longer sufficient to stave off the impact of Inofin's poor financial choices. In August 2009, George reported to Cuomo and Mann that she had spent her "Friday (and every other day) answering for there being no money, embarrassed that the two offices next to [hers] are dark, three investors called to pick up checks and [she] has a computer system that was shut down for non-payment." In that same month, George reported to Cuomo and Mann that she had "covered" payroll by taking out an advance on her corporate credit card.

202.   The Drive entities continued their dismal performance during 2009. At the end of the year, Drive 1, the Raynham location, remained closed with its $4 million in Inofin payables. The Drive 2 and Drive 3 locations generated a combined net income of $260,000, which was approximately one tenth the amount Cuomo, Mann, and George had projected for the combined Drive entities back in 2007. The liabilities of the remaining two operating Drive entities

exceeded their assets by approximately $3 million, and they owed Inofin $4.4 million for working capital and floor plan loans.

203.   By the end of 2009, Prime 4 had spent $3 million in cash, either borrowed from or guaranteed by Inofin.  Prime used this money, ostensibly, to build a dealership in Worcester, Massachusetts on which Drive 4 would commence auto sales operations and make lease payments to Prime 4.  Prime 4 purchased a parcel of real property in Worcester in 2005 for approximately $1 million.  By the end of 2009 Prime 4 had borrowed an additional $2 million on this property, but no dealership operations had opened in Worcester.  None ever would.  At the end of 2009, therefore, Prime 4 had $3 million in borrowings, either directly from Inofin or guaranteed by Inofin, on a property it had purchased for $1 million.  Moreover, Prime 4 had held its borrowed money for three years and counting without any lease income to pay interest on its loans.

204.   On or about April 10, 2010, Cuomo, on behalf of Inofin, submitted a sworn Annual Report to the Commissioner of Banks certifying that Inofin's net worth was $1,964,252 knowing or recklessly disregarding the fact that this net worth was overvalued by at least $8 million because of the failure to account for Drive losses, the uncollectability of the Drive receivables, and the failure to record the costs associated with the discounted sales of Inofin's loan portfolio to MAF.

205.   In submitting this Annual Report, Cuomo also knowingly or recklessly submitted a falsely-inflated adjusted net worth calculation for Inofin.  On the Annual Report form, directly above the entry for Adjusted Net Worth, the form states that the computation of Adjusted Net Worth should omit: "Any assets due from officers or stockholders of the licensee or persons in which the licensee's officers or stockholders have an interest."  Contrary to these directions,

Cuomo reported an Adjusted Net Worth of $1,964,252 that failed to omit the receivables due

from the Prime entities, which Cuomo and Mann owned directly, and the Drive entities, which

Cuomo and Mann owned indirectly through their management and financial control of these

entities despite the sham ownership of Walsh. At the time, the Drive entities owed Inofin

approximately $12.3 million, and the Prime entities owed Inofin approximately $13.2 million.

Accordingly, Cuomo knowingly or recklessly submitted an Adjusted Net Worth to the Division

of Banks that was falsely inflated by approximately $25.5 million.

   *x. 2010—SEC Investigation, Massachusetts Division of Banks Suspension, and Inofin's Last
   Investor Pitch.*

   206.   In November 2009, the Massachusetts Division of Banks commenced an examination of

Inofin. During the course of the examination, the Division learned, apparently for the first time,

that Inofin had sold a substantial portion of its car loans to MAF and that the financial effect of

those transactions were not reflected in any of the filings or certifications that Inofin had made

with the Division. This revelation raised a concern about Inofin's ability to maintain the

minimum financial requirements necessary for licensure. Accordingly, at the behest of the

Division of Banks, in June 2010, Inofin and the Division entered a consent order that, among

other things, directed Inofin to engage an accounting firm "to prepare and submit to the Division

an audit of the financial statements for the year 2009" as well as "an audited 2008 year-end

balance sheet and a 2008 income statement review."

   207.   The Consent Order entered by the Division of Banks specifically barred R.T. from

preparing the required financial statements.

   208.   Inofin engaged a new local accounting firm that began work to prepare the financial

statements required by the Division of Banks. In December 2010, the new accounting firm

concluded that it could not express any opinion regarding the required financial statements

because Inofin management was either unable or unwilling to produce the financial records necessary to do the audits and review. On January 20, 2011, the Division of Banks entered a consent order requiring Inofin to surrender its license to operate as a subprime auto lender in Massachusetts.

209. During the pendency of the Division of Banks-ordered audit, Inofin began a campaign to solicit Inofin's investors to agree to exchange their debt securities for equity securities in order to solve Inofin's solvency problem.

210. As part of this effort, Inofin engaged R.T. to perform an audit of Inofin's 2009 balance sheet. On December 10, 2010, R.T. issued an audit opinion on Inofin's 2009 balance sheet. According to this "audited" balance sheet, by the end of 2009 (nearly 13 months earlier), the company had incurred at least $35 million in accumulated deficits from its inception, the company's liabilities exceeded its assets by approximately $29 million, and the company was therefore insolvent on a balance sheet basis. This 2009 balance sheet further disclosed that at least $19 million worth of these losses were attributable to loans that Inofin made to the Drive and Prime entities. The balance sheet notes reported that the Drive entities were "insolvent," and therefore their receivables, totaling $12.3 million, had to be "written off in their entirety." In addition, the balance sheet notes reported that the Prime entity receivables of $13.2 had a net realizable value of $6.4 million, resulting in a write down of assets of $6.8 million.

211. On or about December 31, 2010, Cuomo and Mann sent this audit opinion and balance sheet to Inofin's investors along with a cover letter. Cuomo and Mann's cover letter purported to explain the causes of Inofin's financial decline, using vague and self-serving explanations of the Drive and Prime loans and the MAF transactions. At the conclusion of the letter, Cuomo and Mann told investors that they were working on a plan in which investors would solve Inofin's

insolvency problem by exchanging their debt securities for equity shares of Inofin – a company that was balance sheet insolvent by $29 million at the end of 2009.

212.   There were at least two collateral consequences to this disclosure and proposal. The first consequence occurred the next month, on February 9, 2011, when a group of Inofin's investors filed an involuntary petition for bankruptcy proceedings against Inofin under Chapter 7 of the United States Bankruptcy Code. On February 16, 2011, the United States Bankruptcy Court for the District of Massachusetts appointed a Chapter 7 Trustee who continues to oversee the company and its assets.

213.   The second consequence was that some of Inofin's investors immediately realized that the representations made by Cuomo, Mann, and George in the offering and sales of Inofin's securities had been materially false or misleading.

214.   For instance, investor B.G. had called Inofin at the end of 2007 and spoke directly to Cuomo about Inofin and subsequently received through the mail an Investor Package, including the Executive Summary. In the direct conversation with B.G., Cuomo had represented, among other things, that Inofin was in the business of motor vehicle sales financing for subprime borrowers and that the business was thriving in the economic downturn. Following the representations made by Cuomo and in the Investor Package, B.G. and his wife invested $265,000. When B.G read the 2009 audited balance sheet and its accompanying cover letter, he realized that Inofin and its principals had failed to disclose that Inofin was investing in auto dealerships and real estate or that they had incurred significant losses outside their core business. B.G. would not have invested in Inofin if he had been told about the car dealerships, residential real estate, and discounted sales of the auto loan portfolio.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

(Against Inofin, Cuomo, Mann, and George)

215.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 214.

216.  Inofin, Cuomo, Mann, and George knowingly or recklessly, by engaging in the conduct set forth above, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce, or by use of the mails:  (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities.

217.  By reason of the foregoing, Inofin, Cuomo, Mann, and George, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

(Against Inofin, Cuomo, Mann, and George)

218.  The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 214.

219.  Inofin, Cuomo, Mann, and George knowingly or recklessly, by engaging in the conduct set forth above, directly or indirectly, singly or in concert, in connection with the purchase or

sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

220.  By reason of the foregoing, Inofin, Cuomo, Mann, and George, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

### Violations of Section 5(a) and 5(c) of the Securities Act

(Against Inofin, Cuomo, Mann, George, Affeldt, and Kevin Keough)

221.  The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 214.

222.  Inofin, Cuomo, Mann, George, Affeldt, and Kevin Keough directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the Commission or being in effect as to such securities.

223.  Neither Inofin nor its securities have ever been registered with the Commission.

224.  Through the conduct described above, Inofin sold securities to over 275 investors residing in at least 25 different states and the District of Columbia, and obtained proceeds of at least $110 million.

225.  By reason of the foregoing, Inofin, Cuomo, Mann, George, Affeldt, and Kevin Keough, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## FOURTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act

(Against Affeldt and Kevin Keough)

226.  The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 214.

227.  Affeldt and Kevin Keough, directly or indirectly, singly or in concert, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, without being a registered as a broker or dealer or associated with a registered broker or dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

228.  As part and in furtherance of the violative conduct, Affeldt and Kevin Keough regularly promoted Inofin securities to investors and advised investors about the merits of an investment in Inofin.  Affeldt and Kevin Keough also received compensation from Inofin based on their successful promotion efforts that resulted in sales of Inofin securities.

229.  While engaged in this conduct, Affeldt was not registered as a broker or associated with a registered broker or dealer.

230.  While engaged in this conduct, Kevin Keough's promotional activities were not under the supervision or approval of the brokers with which he was associated.

231.  By reason of the foregoing, Affeldt and Kevin Keough, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### FIFTH CLAIM FOR RELIEF

### Nancy Keough Is Liable As A Relief Defendant

232.  The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 214.

233.  Inofin compensated Nancy Keough for Kevin Keough's referrals.  In addition, Nancy Keough and David Affeldt shared an oral agreement to "split 50/50" Inofin referral fees for any investors brought to Inofin by either the Keoughs or Affeldt.

234.  Through this arrangement, from January 1, 2004 through December 2009, Nancy Keough received approximately $368,000 as commissions for Affeldt's and the Keoughs' unlawful activities in violation of Sections 5(a) and 5(c) of the Securities Act, and 15(a) of the Exchange Act, which led to the sale of Inofin securities.

235.  Nancy Keough should be made to disgorge the ill-gotten funds received from Inofin as the proceeds of these securities law violations.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Inofin, Cuomo, Mann, and George, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.

Permanently enjoining Inofin, Cuomo, Mann, George, Affeldt, and Kevin Keough, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## III.

Permanently enjoining Affeldt and Kevin Keough, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## IV.

Ordering Inofin, Cuomo, Mann, George, Affeldt, and Kevin Keough to disgorge the ill-gotten gains they received as a result of their violations of the federal securities laws and to pay prejudgment interest thereon.

## V.

Ordering Inofin, Cuomo, Mann, George, Affeldt, and Kevin Keough to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Ordering Nancy Keough to disgorge her unjust enrichment in the approximate amount of

$368,000, and prejudgment interest thereon.

## VII.

Granting such other and further relief as the Court may deem just and proper.


Dated:   Boston, Massachusetts
         April 14, 2011


On behalf of the Commission,


Richard M. Harper II (MA BBO No. 634782)
Kevin M. Kelcourse (MA BBO No. 643163)
James M. Fay (MA BBO No. 553435)
Kevin B. Currid (MA BBO No. 644413)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-4596 (Currid)
CurridK@sec.gov